UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Moose M. Scheib,　　　　　　　　　　　　　　Case No.: 21-42581
　　　　　　　　　　　　　　　　　　　　　　　Chapter 7
　　　Debtor.　　　　　　　　　　　　　　　　Hon. Mark A. Randon
_____/

Kelly Silvera Jarrett,

　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　Adversary Proceeding
　　　　　　　　　　　　　　　　　　　　　　　Case No.: 21-04167

Moose M. Scheib,

　　　Defendant.
_____/

## **POST-TRIAL OPINION**

**I.　INTRODUCTION**

　　　Like compelling fiction, this Chapter 7 adversary proceeding involves a red diamond and a golden visa.

　　　Natural red diamonds are rare, highly coveted, and very valuable. The Kazanjian Red Diamond—a 5.05 carat, square emerald cut—is claimed to be one of only three natural red diamonds of its size known to exist in the world today. Given its rarity, few collectors worldwide can afford to purchase it for its purported value of

1

between $65 and $100+ million.¹  A handsome commission awaits the broker with sufficient connections to close the sale.

The EB-5 Immigrant Investor Program or "golden visa" allows foreign nationals (and their spouses and unmarried children under 21) to obtain permanent U.S. residence, in exchange for making a substantial financial investment in the United States.  In 2016, one way to qualify for this program was to invest $500,000 into a new commercial enterprise ("NCE"), which would create at least ten full time jobs for U.S. workers.²  Owning an NCE could attract millions of dollars in foreign investment from would-be U.S. residents.

Chapter 7 debtor Moose Scheib (aka Mustapha Scheib),³ a charismatic and perhaps quixotic dealmaker, was involved in both potentially lucrative business ventures: He had an exclusive commission-based agreement to sell the Kazanjian Red Diamond, and he owned CBG CCS, LLC, a nascent business endeavoring to satisfy

---

¹For example, Forbes.com reports that on October 7, 2022, the 11.15 carat "Williamson Pink Star" diamond sold for $57.7 Million.  Though not quite as rare as red, natural pink diamonds are also an uncommon category of colored diamonds.

²Currently, the minimum investment is $800,000 in a "targeted employment area" (i.e., a rural area or an area that has experienced high unemployment) or $1,050,000 in a non-targeted employment area. *See* U.S. Citizenship and Immigration Services, *About the EB-5 Visa Classification*, *available at* https://www.uscis.gov/working-in-the-united-states.

³Silvera alleges Scheib has also used the name Mustapha Cheaib.

2

the EB-5 program's NCE requirement.

Kelly Silvera Jarrett ("Silvera") alleges she invested the $500,000 in Scheib's business to obtain U.S. residency through the EB-5 program. Scheib says Silvera, instead, invested only in his ongoing efforts to sell the red diamond, and the money could be used as he saw fit. In exchange, Scheib claims he promised her a share of his anticipated multi-million dollar commission. Neither venture bore fruit. Scheib exhausted Silvera's investment in less than nine months—mostly on personal items for himself and family, and on transfers to another company he controlled. And later, faced with Silvera's state-court action to get her money back, he filed Chapter 7 bankruptcy. Silvera's adversary proceeding challenges the debt's dischargeability.[4]

Between September 13 and 15, 2022, the Court conducted a two-and-a-half day bench trial. The Court heard testimony from three witnesses, including Silvera and Scheib, and admitted multiple exhibits and two trial depositions. Having observed the demeanor, and evaluated the credibility, of each trial witness and having reviewed all admitted exhibits, the Court finds in favor of Silvera on her conversion and fraud and misrepresentation counts and will enter a treble damage, $1.5 million nondischargeable judgment against Scheib under 11 U.S.C. § 523(a)(2) and

---

[4] On October 11, 2022, Scheib's Order of Discharge was entered. However, as the order makes clear: An example of a debt that is not discharged is one "that the bankruptcy court has decided or will decide [] [is] not discharged in this bankruptcy case."

523(a)(6).

## II. FINDINGS OF FACTS

Silvera met Scheib in 2013, while working as an Executive Producer for Al Jazeera English, an international news network based in Doha, Qatar. They established a friendly, professional relationship. At some point, Silvera, a dual Jamaican and British citizen, became interested in immigrating from Qatar to the United States so her two college-bound sons could further their education. Schieb told Silvera he was a designated EB-5 agent for the Middle East and North Africa and could help. In June of 2016, Scheib formed CBIG CCS, LLC, a company he intended to comply with the EB-5's NCE requirement by creating at least ten new American jobs. CBIG CCS, LLC was to operate as a U.S.-based call center, connecting wealthy foreigners to investment opportunities in the United States.

Scheib convinced Silvera that investing $500,000 in his business was the best way for her to obtain permanent U.S. residence for herself and two sons. To that end, he connected her with Rami Fakouri, a global immigration lawyer, to prepare and file the necessary EB-5 immigration paperwork. After Silvera retained Fakouri, he assigned the matter to attorney Rohit Turkhud.

To further induce Silvera to invest in CBIG CCS, LLC, and as a possible alternative repayment source, Scheib promised to pay Silvera $500,000 from his 9.75% commission or "net consulting fee" upon completion of the Kazanjian Red Diamond sale. Apparently, Scheib had an exclusive commission-based agreement with Michael Kazanjian, the diamond's owner, to market it to potential buyers, including royalty in the gulf region. On June 16, 2016, Scheib and Silvera's commission-sharing agreement was reduced to writing. Although, at trial, Silvera was reluctant to acknowledge her awareness of the agreement and testified she was not expecting any portion of Scheib's commission, she *did* sign it and even helped Scheib identify at least one potential buyer.

On July 3, 2016, using funds primarily obtained from the sale of her home in the United Kingdom, Silvera transferred $475,000.00 to CBIG CCS, LLC. The reference on the bank transfer stated: "EB5 INVESTMENT." Before Silvera's transfer, the newly-created CBIG CCS, LLC bank-account balance was just $100. Scheib knew Silvera's investment in CBIG CCS, LLC was made to obtain residency status in the United States through the EB-5 program. He also knew that Silvera's immigration application would fail, unless his business became operational and created ten new American jobs (i.e., became a qualified NCE). Silvera did not authorize Scheib to use the transferred funds for any purpose other than

5

operationalizing the business or otherwise furthering her EB-5 application. Although Scheib believed Silvera was a wealthy widower, the transfer represented nearly all of her life savings.

Over the next six months, Scheib systematically withdrew almost $280,000 from the CBIG CCS, LLC account. Very little, if any, of the money was spent getting the business off the ground; much was spent on Scheib's personal expenditures including: home mortgage payments, trips, airline tickets, restaurants, grocery and department store purchases, football games, dependent college tuition, hotels, spas, hair salons, cigar shops, and iTunes and Amazon purchases.[5] Unaware of these expenditures, Silvera sought updates from Scheib on the status of CBIG CCS, LLC. After receiving his assurance that things were on track, in December of 2016, Silvera deposited another $25,000 into the CBIG CCS, LLC bank account, bringing her total investment to $500,000.[6] Again, "EB5 INVESTMENT" was referenced on the bank-transfer form.

---

[5]Scheib also transferred a significant amount of Silvera's money to Cedar Bey, another company he owned or controlled. From this account, Scheib made many of the aforementioned personal expenditures.

[6]At no time did Scheib provide Silvera with an accounting of how her $500,000 was being used. Silvera assumed that her investment, therefore, remained in the CBIG CCS, LLC account.

About the same time, Silvera's immigration attorney, Turkhud, began raising serious concerns about the status of her EB-5 investment in CBIG CCS, LLC. Scheib stalled, and when confronted, he or his associate provided insufficient information and updates. In the meantime, he continued to deplete the CBIG CCS, LLC account in a similar fashion. By April 2017, the account balance was at or near $0. Unsurprisingly, Scheib had made little or no progress in getting CBIG CCS, LLC operational, and without sufficient verification about Silvera's business investment, Turkhud withdrew from representing Silvera for her EB-5 application. Without any possibility of a golden visa, Silvera demanded the return of her CBIG CCS, LLC investment. But there was nothing to return.

Scheib's alleged attempt to sell the red diamond to a member of the Qatari royal family also failed–quite spectacularly: After meticulously preparing for His Highness's arrival in New York to view the diamond, down to the smell of his preferred floral bouquet in the meeting room, Scheib and Kazanjian soon managed to displease him by presumptuously mentioning the diamond's $100 million price-tag. Offended, His Highness soon returned to Qatar without making an offer.

Before the deal upended, Scheib explained his version of affairs in a later-transcribed voicemail to Silvera:

> Kelly, I'm sorry that this has been torture. You invested in an EB-

7

21-04167-mar    Doc 46    Filed 10/31/22    Entered 10/31/22 13:23:14    Page 7 of 13

5 five business with me, and I also invested in that EB-5 business. And I've put over three years of time, energy, and effort into it. And no one could have predicted where the market went. When Trump got elected, it made things a lot harder on many different levels, including the confidence of people that were in the process of being – of investing. So, there was a lot that happened at the same time.

      I gave you some security in the deal that really wasn't part of the deal. And I do believe that that security will pan out. I know it's been tough, and I know it's been, you know, torturous for you. But I've been doing everything I can on my end to make it right, to move it forward properly, to exercise good business judgment. And that's really where it's at, Kelly.

      I do believe that that deal with His Highness will move forward. But I could never have predicted it would take this long, and it really drained me, in addition to having set up that – all those folks to work and that responsibility of setting up that investment. And then, you changing your mind halfway between, which is fine. I agreed to give you a refund.

      And I'm trying to work through it as best as I can. I've been trying everything, including selling family land and working through that process and putting a lot of money into that to get it to the point of sale. So, I've been trying all different avenues. And I don't know, everything happens for a reason I like to say. And I really want to work with you. I know you entrusted me, and I don't take that lightly, And it's a big responsibility for me, too.

After several more months of unkept promises to refund her investment, Silvera retained counsel and filed a state-court action against Scheib to get her money back; Scheib filed Chapter 7 bankruptcy.

## III.   CONCLUSIONS OF LAW

The Court has subject-matter jurisdiction over this adversary proceeding under

8

28 U.S.C. § 1334(b). This is core proceeding under 28 U.S.C. § 157(b)(2)(I).[7]

Silvera's Complaint contains four counts, two of which–if proved by a preponderance of the evidence–may result in entry of a nondischargeable judgment against Scheib: Count I, Conversion (i.e., statutory conversion under Michigan law), and Count III, Fraud and Misrepresentation. Silvera also seeks an award of "exemplary/mental anguish damages" in an amount of no less than $1.5 million.[8]

### A. *Silvera has Proved Statutory Conversion Under Michigan Law*

To prevail on her statutory conversion claim, Silvera must establish that Scheib converted her property to his "*own use*." MICH. COMP. LAWS § 600.2919a(1)(a) (emphasis added); *Aroma Wines & Equip., Inc. v. Columbian Distribution Services, Inc.*, 497 Mich. 337, 354; 871 N.W.2d 136, 138 (2015). At common law, conversion required a "distinct act of dominion wrongfully exerted over another's personal property." *Id*. at 351-52. Thus, to prevail under the statute, Silvera must prove Scheib wrongfully used her money for some purpose personal to his interests. *Id*. at 358-59. If she proves statutory conversion, Silvera "may recover" treble damages. MICH. COMP. LAWS § 600.2919a(1). Based on the statute's permissive language, courts

---

[7] The parties consented on the record that the Court has jurisdiction to hear and determine this matter and to enter appropriate final orders and judgments in this case.

[8] This amount was requested at trial; Silvera's Complaint requests "no less than $10 million" in exemplary/mental anguish damages.

9

have held that "the trier of fact has the discretion to decide whether to award treble damages[.]" *LMT Corp. v. Colonel, L.L.C.*, No. 294063, 2011 WL 1492589, at *3 (Mich. April 19, 2011); *see also In re Stewart*, 499 B.R. 557, 570 (Bankr. E.D. Mich. 2013) ("[t]rebling isn't automatic; it is within the Court's discretion based on what is fair under the circumstances"). Treble damages are punitive in nature, meant to punish dishonest defendants and set an example. *Alken-Ziegler, Inc. v. Hague*, 283 Mich. App. 99, 104 (2009).

Silvera has proved statutory conversion, and the Court awards treble damages. Silvera invested in CBIG CCS, LLC–not in Scheib's pursuit of a buyer for the red diamond. The Court finds Silvera's testimony more credible than Scheib's on this issue. Other evidence corroborates Silvera's version of events, including: (1) that her transfer was made to CBIG CCS, LLC with the memo indicating "EB-5 INVESTMENT"; (2) her total investment was $500,000 (the minimum amount required for EB-5 investment in an NCE); (3) Scheib recommended immigration counsel, the Fakoury Law Group, to complete Silvera's EB-5 paperwork; (4) Silvera retained the Fakouri Law Group; (5) the trial depositions of attorneys Fakouri and Turkhud confirm Silvera's investment was for Scheib's NCE; and (6) Scheib's transcribed voicemail to Silvera stated her investment was for CBIG CCS, LLC, and the red diamond commission sharing agreement was merely security for that

10

21-04167-mar    Doc 46    Filed 10/31/22    Entered 10/31/22 13:23:14    Page 10 of 13

investment. Scheib had no permission to spend Silvera's CBIG CCS, LLC investment as he pleased.

Given the extent of Scheib's dishonesty, trebling of the $500,000 damages is also appropriate. Scheib induced Silvera to invest in his business, knowing he planned to use the money in other ways. He converted Silvera's investment, while falsely reassuring her and attorney Turkhud that the CBIG CCS, LLC project was on track. As a result, Silvera returned to Jamaica after leaving Qatar, without a U.S. visa; deprived of her life savings; and, therefore, unable to fund her children's education, or properly support herself. Scheib meanwhile spent Silvera's money lavishly on personal luxuries. Using Silvera's money, he even paid for his child's education, while Silvera's eldest son was forced to withdraw from college for unpaid tuition.

### B. The Statutory Conversion Treble Damages are Nondischargeable

Section 523(a)(6) provides that debts for "willful and malicious injury by the debtor" are nondischargeable. Conversion can constitute an injury to property that falls within the scope of section 523(a)(6). *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934). However, the conversion must be both willful and malicious. *Kawaauhau v Geiger*, 523 U.S. 57, 61 (1998) ("The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional

*injury*, not merely a deliberate or intentional *act* that leads to injury.") (Emphasis in original). "A conversion which is innocent or technical" or "an honest but mistaken belief . . . that powers have been enlarged or incapacities removed" is not covered by section 523(a)(6). *Davis*, 293 U.S. at 332.

There was no mistaken belief here. Knowing Silvera had not authorized his personal use of the funds invested in CBIG CCS, LLC, Scheib intentionally spent her money lavishly on personal items and to prop up his other company, Ceder Bey. He also misled Silvera and her immigration counsel when they inquired about the status of her NCE investment–essential to obtaining EB-5 approval.[9]

### C. *Silvera Has Not Proved Damages For Mental Anguish*

Silvera also seeks damages for mental anguish in the form of either exemplary or actual damages. The Michigan Supreme Court has determined that "actual damages . . . include compensation for mental distress and anguish." *Veselenak v.*

---

[9] The Court also finds that Scheib's debt is nondischargeable under § 523(a)(2). *See Husky Int'l Electronics, Inc. v. Ritz*, 578 U.S. 356, 363 (2016) (There can be inevitable overlap with respect to nondischargeable claims under §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) such that "debtors who make false representations under §523(a)(2)(A) could likewise also inflict 'willful and malicious injury' under §523(a)(6)"). Scheib fraudulently induced Silvera to invest in CBIG CCS, LLC knowing he intended to misappropriate the money. Relatedly, the statutory conversion, as proved, is also nondischargeable under § 523(a)(2) as actual fraud, i.e., as a "deceit, artifice, trick, or design involving direct and active operation of the mind used to circumvent and cheat another." *In re Moschell*, 607 B.R. 487 (Bankr. W.D. Penn. 2019).

*Smith*, 414 Mich. 567, 574 (1982); *see also Wiskotoni v. Michigan Nat'l Bank-West*, 716 F.2d 378, 389 (6th Cir. 1983) (under Michigan law, actual damages for mental distress and anguish are recoverable in a tort case). Exemplary damages for injuries to feelings are duplicative of an award of ordinary damages for mental distress and anguish. *Veselenak*, 414 Mich. at 572.

While Scheib's conversion and dishonesty financially devastated Silvera, other than her general disappointment in his failure to return her investment, the record lacks sufficient proof that she suffered mental distress or anguish.

## IV. CONCLUSION

For the foregoing reasons, the Court finds in favor of Silvera on her conversion count and will enter a treble damage, $1.5 million nondischargeable judgment against Scheib under 11 U.S.C. § 523(a)(2) and 523(a)(6).

**IT IS ORDERED**.

**Signed on October 31, 2022**

/s/ Mark A. Randon
**Mark A. Randon**
**United States Bankruptcy Judge**